950 So.2d 518 (2007)
Jeanne F. REID, as Personal Representative of the Estate of Phillip H. Reid, Jr., for the benefit of Jeanne F. Reid and the Estate of Philip H. Reid, Jr., deceased, Appellant,
v.
Joseph J. ALTIERI, M.D., and Joseph J. Altieri, M.D., P.A., a Florida professional association; Larry James PA-C; Indian River Memorial Hospital, a Florida corporation, individually and d/b/a Center for Emotional and Behavioral Health at Indian River Memorial Hospital, Appellees.
No. 4D05-3650.
District Court of Appeal of Florida, Fourth District.
March 14, 2007.
*520 Wallace B. McCall, P.A., Jupiter; Murphy, Reid, Pilotte & Ord, Palm Beach; and Philip M. Burlington of Burlington & Rockenbach, P.A., West Palm Beach, for appellant.
Shelley H. Leinicke and H. Wayne Clark of Wicker, Smith, O'Hara, McCoy, Graham & Ford, P.A., Fort Lauderdale, for appellees Joseph J. Altieri, M.D., and Joseph J. Altieri, M.D., P.A.
POLEN, J.
Appellant, Jeanne F. Reid, as personal representative of the estate of Philip H. Reid, Jr., deceased, appeals the trial court's order denying Reid's motion for a new trial in this medical malpractice/wrongful death case. Following a jury trial, the jury returned a verdict finding Appellants, Dr. Joseph J. Altieri and Larry James, respectively, 0.01 % and 0% negligent in the death of Philip H. Reid. The trial court entered a final order upholding the jury's verdict. For the reasons set forth below, we affirm.
On November 20, 2002, Philip H. Reid, Jr., committed suicide by hanging. Jeanne Reid, his widow, filed a wrongful death action against Appellants, Dr. Altieri and Mr. James, his physician's assistant, as well as against Indian River Memorial Hospital ("the Hospital"). Prior to trial, Reid and the Hospital participated in a mediation, reached a settlement, and the Hospital was dropped from the lawsuit. Following trial, the jury returned a verdict finding the Hospital 99.99% negligent, Dr. Altieri 0.01% negligent, and Mr. James not negligent. At the time of his death, Philip was seventy-three, and working as an attorney. His wife Jeanne worked with him full time as a legal assistant and office administrator. Philip had periodic periods of depression throughout the marriage. The periods of depression occurred approximately every eight years, but began occurring more frequently in the late 90's and early 2000's. Philip was institutionalized during the first depression, but was treated on an out-patient basis during the other periods of depression. Philip took anti-depressant medication during these periods, but stopped taking the medication after the periods of depression passed.
At some point, Philip began seeing Dr. Director, a psychiatrist who placed him on a drug maintenance regime. In 2002, Philip began seeing Dr. Altieri, because he did not feel he was improving. As part of the new patient process, Philip made an appointment with Larry James, Dr. Altieri's physician's assistant, a certified physician's assistant with the state of Florida. Dr. Altieri classified James as "an exemplary professional . . . operating in the superior range." James interviewed Philip for approximately thirty minutes and took a history of Philip's condition. Philip indicated he had feelings of severe depression, helplessness and worthlessness, but denied having homicidal or suicidal ideations, although he had thought about death.[1] Philip did not see Dr. Altieri at this appointment, but later that same day, Dr. Altieri reviewed the notes that James took during the interview and cosigned them.
As a physician's assistant, James was qualified to diagnose Philip and to put together a treatment plan for him. James diagnosed Philip as having major depressive disorder and changed Philip's medications, as they did not seem to be combating *521 his depression. James instructed Philip to start taking the new medication and to gradually taper off the old medication. James also recommended Philip have some sessions with another doctor. Philip did not appear to need hospitalization at this point.
Philip made an appointment to see James in two weeks, but called and made an earlier appointment, complaining that the medicine was not working and that he was feeling worse than before. Philip asked if he could be hospitalized. James called the Center for Emotional and Behavioral Health ("CEBH") which was part of the Hospital, but no beds were available. Philip was instead admitted into Lawnwood, another psychiatric facility. He stayed there overnight, but was discharged the next day. Approximately a week later, Philip took an overdose of sleeping pills.
Philip was taken to the Hospital, where he remained for two days, and was then transferred to the CEBH. Dr. Altieri conducted a mental status exam of Philip during the course of the transfer. This was the first time that Dr. Altieri had seen Philip in person. Philip denied that he was currently having "any suicidal ideas, intent or plan." While Philip was hospitalized at CEBH, he was seen daily by either Dr. Altieri or another physician, Dr. Barrett. At some point during Philip's hospitalization, Jeanne sent Dr. Altieri a fax asking if Philip could be released for an upcoming visit from his son and grandson. Dr. Altieri was not sure if Philip would be ready for release, but went ahead and tentatively planned to release him on November 15, 2002 for the family visit. As the 15th neared, Philip showed gradual signs of improvement and expressed excitement about going home for the visit.
On the morning of November 15th, Dr. Altieri approved Philip's discharge, noting on the discharge form that Philip still felt suicidal, although less than when he checked into CEBH. Later that morning, prior to the discharge, Dr. Altieri received a phone call from a CEBH nurse expressing reservations about Philip's discharge, as he had expressed some suicidal thoughts. Dr. Altieri canceled the discharge, and met with the Reids to reevaluate Philip. The Reids were adamant that Philip be allowed to go home for the family visit, and Jeanne promised Dr. Altieri that she would supervise Philip and return him if problems developed. Philip admitted to having "fleeting suicidal thoughts," but "denied any suicidal ideas, intent or plan." Philip agreed to contact Dr. Altieri and to talk to Jeanne if he had any recurring suicidal thoughts. Dr. Altieri testified that despite the Reids' determination that Philip be released, he would not have released Philip if he had felt Philip was in danger. However, after the evaluation, Dr. Altieri felt Philip's release was proper.
Dr. Altieri made the Reids agree to a contract for safety, in which they promised that if Philip began having suicidal thoughts again, they would come back to CEBH to re-admit him. A contract for safety involves the patient agreeing to do certain things and the doctor agreeing to do certain things. The contract for safety indicates the doctor knows there is some risk in releasing the patient and is assuming some increased responsibility towards the patient. As part of this contract for safety, Dr. Altieri agreed that if Philip's condition worsened, he would be reevaluated and admitted to the Hospital if suicidal. The Reids agreed to this, and Philip was released.
After the family weekend, Philip told Jeanne that he was having suicidal thoughts and needed to return to the Hospital. Jeanne called Dr. Altieri's office and CEBH and was told to be admitted they first had to go to the Hospital's emergency *522 room. Dr. Altieri testified the best way to have a patient admitted to CEBH is to first go through an assessment and referral at the Hospital. The CEBH does not have a patient registration center, and Dr. Altieri did not want to send a voluntary patient, who might be frightened and scared, directly to a psychiatric unit, where they would have to wait for admission. Further, if the patient went directly to the CEBH, they could not be prescribed medication until they were entered into the registration system, which had to be done at the Hospital. This could lead to significant delays in treating a patient. After a patient went through an assessment at the Hospital, the treating psychiatrist, in this case Dr. Altieri, was to be called and notified as soon as the evaluation was complete. Dr. Altieri testified the assessment method of admitting a patient to the Hospital was actually faster than direct admission.
Dr. Altieri testified he instructed his assistant to call the Hospital's assessment and referral office to tell them the Reids were on the way. Dr. Altieri expected to hear back from the hospital that night and waited to fax admission orders to the Hospital until he received a call, as the orders would be useless until the patient was in the Hospital's system. Dr. Altieri had given the Hospital a list of six phone numbers that they could use in reaching him. Jeanne never heard back from Dr. Altieri that night, and Dr. Altieri denied receiving any messages to call Jeanne back. Based on Jeanne's call to the office, Dr. Altieri agreed Philip should be admitted to the Hospital that evening.
When the Reids got to the Hospital, they immediately saw a triage nurse. Philip told the nurse he was suicidal and said he would commit suicide by hanging himself. The triage nurse took the Reids to see another employee, Tiffany Banner Davis, who conducted assessment and referrals for the Hospital. Ms. Davis had only recently started at the Hospital. Philip relayed the same information to Ms. Davis. Ms. Davis asked Jeanne to leave the room, and when Ms. Davis called her back in, she informed Jeanne that Philip had a panic attack, and he was now okay to go back home. Jeanne protested, telling Ms. Davis that Philip was there to check in, and that Dr. Altieri had given them orders to check in. Ms. Davis told them that Philip did not meet the criteria to check in and sent them home. Ms. Davis testified that she attempted to reach Dr. Altieri, but was unable to contact him, so she called Dr. Adams, the Hospital's on-call physician instead. Ms. Davis did not tell Dr. Adams any specifics about Philip's visit, but merely relayed she was having trouble reaching Dr. Altieri. Dr. Adams did not tell her to release Philip and encouraged her to continue to try and contact Dr. Altieri.
Dr. Altieri never received a call from the Hospital that night, and between 10:30 and 11:00 p.m., he called the Hospital himself. Dr. Altieri talked to Ms. Davis and was told she had sent the Reids home. Ms. Davis told Dr. Altieri that Philip did not meet the criteria for admission, i.e., he was not suicidal, and that after going over the case with Dr. Adams, Dr. Adams had approved Philip's release. Dr. Altieri informed Ms. Davis she did not have the authority to release Philip, and questioned her as to why she had not contacted him. Ms. Davis told him she had called his beeper, but Dr. Altieri denied getting any pages from the Hospital, or any other calls. Ms. Davis admitted she had not tried any of Dr. Altieri's other contact numbers. Dr. Altieri called Ms. Davis an imbecile and asked to speak to her supervisor.
*523 Dr. Altieri called Marriamma J. Pyngolil, Ms. Davis's supervisor. Dr. Altieri related that he wanted Philip admitted and that Ms. Davis had released him. Dr. Altieri told Ms. Pyngolil that he would deal with the situation in the morning. Dr. Altieri did not call the Reids that evening, due to the lateness of the hour. Dr. Altieri testified that he respected Dr. Adams's opinion in clearing Philip, and because he had no knowledge that Philip had expressed ideas of self-harm, or that Dr. Adams had not actually seen Philip or cleared Philip for release, decided to call the Reids in the morning.
The next morning Dr. Altieri received three faxed pages of evaluation on Philip. The triage nurse's evaluation was not included in these pages, and he did not receive the triage nurse's evaluation until after Philip's suicide. Dr. Altieri did not call the Hospital to look for more information, because he thought the Hospital had sent all the relevant information. Ms. Davis's evaluation did not contain any indication that Philip had stated he was suicidal, or that he was going commit suicide by hanging. After reviewing the evaluation, Dr. Altieri wrote a note to himself that Philip should see Larry James, and also made an indication that perhaps Philip should be placed on 40 milligrams of Geodon, a sleep aid, at bedtime.
Jeanne received a phone call from Dr. Altieri the next morning, at approximately 8:30. Dr. Altieri asked that the Reids come in to see Mr. James, and they did. Dr. Altieri felt that James was entirely capable of handling this follow-up visit. Dr. Altieri had not informed James of the events of the previous evening, and the remaining records from the Hospital detailing Philip's visit were not faxed to Dr. Altieri's office until two days later. James had not been involved in Philip's treatment for about a month, just prior to Philip's initial suicide attempt, and was unaware of the suicide attempt or the contract for safety. James thought that Philip's appointment was set up by the Hospital's emergency personnel referring Philip back to Dr. Altieri, not by Dr. Altieri directly.
Philip told James that the reason he had gone to the Hospital was because he had experienced a panic attack and had some mood swings. James did not believe that Philip was suicidal, although Philip did tell him that he told the person at the Hospital he was going to hurt himself. Philip denied having "thoughts of death, suicidal or homicidal ideas, intent or plan." James told Philip to take more medication, and the Reids went home. Dr. Altieri testified there was no indication from this office visit that Philip should be hospitalized, but in hindsight believed Philip had concealed his true feelings from James during the course of the visit.
The next morning, the Reids both got ready for work, but then Philip told Jeanne he was going back to bed for awhile, because he had not slept well the night before. Jeanne went to the office, but called home several times to make sure Philip was all right. Each time he answered the phone and sounded fine. Philip told Jeanne that he was getting ready to come to the office, but when he had not arrived by 10 a.m., Jeanne tried to call him again. Philip did not answer. Jeanne drove home, and found Philip hanging from the garage door opener.
At trial, plaintiff's expert, Dr. Richard Hall, testified that Dr. Altieri acted outside the standard of care in not following up with the Reids after learning that Philip was not admitted to the Hospital, and by not making sure that Philip was admitted to the Hospital that evening. Dr. Hall pointed out that since the parties had entered into a contract for safety, Dr. Altieri should have known that Philip was an increased *524 risk by his actions in going to the Hospital that evening. In Hall's opinion, Dr. Altieri used poor judgment in not seeing or evaluating Philip when he came in the next day, and in allowing James to conduct the assessment. Hall also believed if Dr. Altieri knew Philip was suicidal, it was a breach of care to not inform James of these developments prior to Philip's appointment with James.
In Hall's opinion, Philip had developed a phenomenon called "flight to health." This phenomenon was indicated by Philip's suicidal intent one moment and miraculous recovery overnight. Had James known about the sudden changes in Philip's behavior, it might have acted as a red flag, warning him of the danger. It was Hall's opinion that Philip had already made the decision to kill himself prior to seeing James, and that James misdiagnosed Philip. Hall agreed that Ms. Davis did not act within the standard of care by releasing Philip prior to speaking with Dr. Altieri, but felt that Dr. Altieri, as Philip's doctor, had the responsibility and authority to admit Philip to the Hospital.
Defense expert Dr. Richard Greer testified Dr. Altieri did not act outside of the standard of care by not contacting the Reids that evening, as he had been told that Dr. Adams, the Hospital's medical director, had assessed Philip. Greer agreed Ms. Davis acted outside the standard of care in assessing Philip, by spending only twenty minutes in conducting the assessment. Further, Ms. Davis acted outside the standard of care in failing to contact Dr. Altieri prior to releasing Philip, and in not relaying that Philip was suicidal, either to Dr. Adams or in the fax to Dr. Altieri.
Greer did not believe Philip met the criteria for voluntary admission to the Hospital when he met with James the day after he was refused admission. Greer agreed that a window of opportunity to prevent Philip's suicide was missed when he was denied admission to the Hospital. At this point, Greer believed Philip had most likely made up his mind to kill himself, and to deceive both his wife and James. Greer did not believe James would have been able to pick up on the signs of this deception. Greer testified that both Dr. Altieri and James acted at or above the standard of care in treating Philip. While Greer agreed Philip's suicide would have been prevented in the short term by his admission to the Hospital, he testified there was a high likelihood of Philip becoming depressed again and eventually committing suicide.
Prior to deliberations, the jury asked what would constitute the minimum percentage of negligence that could be assigned to a party. The parties agreed that the amount could be anything from zero to one hundred percent. The jury also inquired as to whether the Hospital would be materially liable if they returned a verdict finding the Hospital negligent. The parties agreed that the jury should be told that "[t]he instructions and verdict form address all the issues concerning [the Hospital]."
The jury returned a verdict finding both Dr. Altieri and the Hospital negligent, but assigning one hundred percent of the negligence to the Hospital. The trial court determined this was an inconsistent verdict and sent the jury back to determine an apportionment of negligence to Dr. Altieri. The jury asked if .01 percent would be acceptable as an apportionment. The trial court stated "I don't know anything that would prohibit .01 percent." The jury returned a verdict finding the Hospital 99.99% negligent, Dr. Altieri .01% negligent, and Larry James not negligent.
*525 Jeanne Reid moved for a new trial, alleging the jury's verdict was against the manifest weight of the evidence. The motion was denied, and this timely appeal followed. The estate argues the jury's verdict is against the manifest weight of the evidence, as the jury found that Dr. Altieri was negligent but assigned him only .01% of the blame. Reid argues the jury's verdict was influenced by matters outside the record, such as the economic consequences of its verdict, and the evidence showed that Dr. Altieri was more than .01% negligent.
"The standard of review applicable to an order on a motion for new trial is abuse of discretion." Taylor v. Magana, 911 So.2d 1263, 1266 (Fla. 4th DCA 2005). "If reasonable people could differ as to the propriety of the court's ruling, then the abuse of discretion standard has not been met." Id. (citing Canakaris v. Canakaris, 382 So.2d 1197 (Fla.1980)). A jury verdict can be overturned if found to be against the manifest weight of the evidence, but the trial court cannot substitute its view of the evidence for that of the jury. Brown v. Estate of Stuckey, 749 So.2d 490, 494 (Fla.1999).
When a motion for new trial is made it is directed to the sound, broad discretion of the trial judge, who because of his contact with the trial and his observation of the behavior of those upon whose testimony the finding of fact must be based is better positioned than any other one person fully to comprehend the processes by which the ultimate decision of the triers of fact, the jurors, is reached.
When the judge, who must be presumed to have drawn on his talents, his knowledge and his experience to keep the search for the truth in a proper channel, concludes that the verdict is against the manifest weight of the evidence, it is his duty to grant a new trial, and he should always do that if the jury has been deceived as to the force and credibility of the evidence or has been influenced by considerations outside the record.
Cloud v. Fallis, 110 So.2d 669, 673 (Fla. 1959).
Reid argues the jury's verdict, which apportioned only .01% of the negligence to Dr. Altieri, is questionable and unprecedented in Florida's case law, and against the manifest weight of the evidence. "When the percentages of liability are contrary to the manifest weight of the evidence, the trial court must treat this defect as an error in the finding of liability itself. The only remedy is to order a new trial on all issues affected by the error." Rowlands v. Signal Constr. Co., 549 So.2d 1380, 1383 (Fla.1989). "[T]he new trial may not be granted merely because the trial court disagrees with the percentages, but only because the percentages are against the manifest weight of the evidence." Id.
The parties have cited no cases, nor has our own research revealed any, where the apportionment of such a minute percentage of fault has been held to warrant a new trial. Indeed, on the record before us, the jury could well have found Dr. Altieri to be without fault at all. We are unable to find an abuse of discretion in the trial court's denial of a new trial in this case. Accordingly, the judgment below is affirmed.
KLEIN and MAY, JJ., concur.
NOTES
[1] According to expert testimony in this case, there are two phases of suicide thinking. The first is suicidal thoughts, in which the person has had a thought of wanting to hurt himself. The second is suicidal intent, when a person has a plan by which to carry out these thoughts. Philip had not developed any suicidal intent at this point.